AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original



LODGED
CLERK, U.S. DISTRICT COURT
3/30/26
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

# UNITED STATES DISTRICT COURT

FILED
CLERK, U.S. DISTRICT COURT
**March 30, 2026**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ 1V _____ DEPUTY

for the

Central District of California

United States of America

v.

Lolita Beronilla Minerd,

Defendant.

Case No.   2:26-mj-01807-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

[18 U.S.C. §§ 1347]

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about May 1, 2023, in Los Angeles County and elsewhere, defendant LOLITA BERNILLA MINERD, did knowingly and willfully execute and willfully caused to be executed a scheme and artifice to defraud a health care benefit program affecting commerce, that is Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing to be submitted a false and fraudulent claim from Topanga Hospice to Medicare, namely claim number 22312100184104CAR for beneficiary R.B., for purported hospice services, for which Topanga billed Medicare approximately $6,400.00 in violation of 18 U.S.C. § 1347.

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Kelly Sullivan, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        03/30/2026

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexandra Michael (213) 500-9356

**TABLE OF CONTENTS**

I.    INTRODUCTION...........................................1

II.   PURPOSE OF AFFIDAVIT..................................2

III.  SUMMARY OF PROBABLE CAUSE............................2

IV.   STATEMENT OF PROBABLE CAUSE..........................5

      A.   BACKGROUND INFORMATION REGARDING MEDICARE
           BENEFITS.........................................6

           1.   Medicare Enrollment for Providers..........6

           2.   Medicare Claim Submission..................7

           3.   Medicare Payments to Providers.............8

      B.   MINERD Controlled TOPNAGA ......................11

      C.   Beneficiary Interviews Confirm that TOPANGA Is
           Fraudulently Billing Medicare For Services Never
           Provided Or Not Medically Necessary.............16

           1.   Medicare Beneficiaries T.B. and R.B........17

                a.   Interview of T.B. and R.B............17

                b.   Text message from L.M. to MINERD
                     regarding M.S., R.B. and T.B.........19

                c.   Interview of Dr. K.K., PCP for T.B. and
                     R.B..................................20

                d.   Medicare Claims Data for T.B.........22

                e.   Medicare Claims Data for R.B.........22

           2.   Medicare beneficiaries M.A. and L.A........23

                a.   Interview of M.A. and L.A............23

                b.   Medicare Claims Data for M.A.........24

                c.   Medicare Claims Data for L.A.........24

           3.   Medicare Beneficiary M.Ab..................25

                a.   Interview of M.Ab....................25

                b.   Interview of Dr. L.R., Primary Care
                     Physician for M.Ab...................26

i

       c.    Medicare Claims Data for M.Ab.........27

  D.    MINERD Was Aware Patients at TOPANGA Didn't Qualify For Hospice Care.......................27

  E.    MINERD's Communications and Payments with Marketers G.C., J.C., and R.T. Support An Illegal Kickback Scheme................................29

V.    MEDICARE Claims Data Analysis.......................36

VI.  FINANCIAL ANALYSIS.................................38

  A.    TOPANGA Bank Accounts and Related Bank Accounts.38

VII. CONCLUSION........................................39

**<u>AFFIDAVIT</u>**

I, Kelly M. Sullivan, being duly sworn, declare and state as follows:

## I.  <u>INTRODUCTION</u>

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice.  I have been a Special Agent since 2008 and am currently assigned to a white-collar crime squad.  Since becoming a SA, I have investigated a variety of white-collar crimes including health care fraud, financial institution fraud, money laundering and other related criminal offenses, as well as national security matters.  The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observation and experience, as well as information obtained from other law enforcement personnel.  This affidavit is offered for the sole purpose of establishing probable cause for the issuance of the requested arrest warrant and does not purport to set forth all the facts I have learned during the course of the investigation.

2.   In the course of this investigation and my investigation of other health care fraud schemes, I have interviewed numerous persons, including witnesses who were Medicare beneficiaries and primary care physicians; reviewed numerous records and pertinent data; read interviews and other reports written by other law enforcement officers; and became

1

familiar with the manner and means by which health care fraud schemes are operated.

## II. **PURPOSE OF AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint against and arrest warrant for Lolita Beronilla Minerd ("MINERD") for a violation of 18 U.S.C. § 1347 (health care fraud) by submitting or causing the submission of Medicare claim number 22312100184104CAR on May 1, 2023, for purported hospice services to R.B. in the amount of $6,400.00.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. In addition, the events described in this affidavit occurred on or about the dates provided herein. Where figures, calculations, dates, and times are reported herein, they are approximate.

## III. **SUMMARY OF PROBABLE CAUSE**

5. MINERD is the owner and operator of Topanga Hospice Care, Inc. (hereinafter "TOPANGA"). From July 24, 2020, through April 24, 2025, MINERD used TOPANGA to submit more than $9,174,117 in fraudulent hospice claims for purported hospice services to Medicare, for which Medicare has paid more than

2

$8,510,448. Witness interviews, bank records, and other evidence show that MINERD controls TOPANGA and that MINERD caused TOPANGA to bill Medicare for hospices services for beneficiaries that were not eligible for hospice services, often did not know the services rendered to them were for hospice, did not want hospice services, and/or did not have the diagnosis listed on the claims submitted to Medicare.  Additional evidence supports that MINERD through TOPANGA paid beneficiaries and paid kickbacks to marketers for the referral of purported hospice patients to TOPANGA.

6.    On October 24, 2024, agents executed search warrants at the business location for TOPANGA (8:24-MJ-00519) and of MINERD's person, which included her phone (8:24-MJ-00520).  On April 15, 2025, agents executed search warrants for email accounts associated with Google, LLC, Yahoo, Inc., Microsoft Corporation USA, and HospiceMD to obtain medical records.

7.    Interviews with employees at TOPANGA verified that MINERD "handles everything" including: marketing, patient admissions, patient referrals, and checking patient eligibility, and she was described as giving diagnoses for admissions purposes as opposed to the information coming from the beneficiaries or medical records.  MINERD's phone contained text messages and voicemails indicative of paying patients and paying kickbacks for patient referrals, such as using coded language including terms like "gift" and "chocolate" to describe illegal kickback payments when communicating about beneficiaries.

8.    Interviews of beneficiaries, their family members, and/or primary care physicians ("PCPs") revealed TOPANGA has billed for hospice services allegedly provided to Medicare beneficiaries who were not terminally ill and, therefore, not eligible for hospice services.  Of the PCPs that were interviewed, not one of them stated the beneficiary for whom TOPANGA had billed for hospice services had been diagnosed with a terminal illness where they had six months or less to live, nor had any of them recommended their patients for hospice services.

9.    Numerous beneficiaries had common addresses and/or live far from the facilities, which is consistent with recruitment by marketers.  One beneficiary couple recalled being approached at a market about signing up and were then visited at their home by MINERD and three other employees from TOPNAGA. MINERD and the three other employees from TOPANGA told the married couple if they signed up everything would be free, and they were also promised $300 a month in addition to the services.  The $300 per month was delivered in an envelope in cash ($600/month for 6 months).  Neither beneficiary stated they had a terminal disease, which was confirmed by their PCP, and the couple reported receiving items they didn't need like Ensure, non-prescription vitamins, and wheelchairs.

10.   Other beneficiaries interviewed were similarly situated to the couple described above.  They all stated they were referred to TOPANGA by a friend, family member, acquaintance, individual at a market, or their group home

4

operator.  None of the beneficiaries had been referred to hospice by their PCP, and nearly every beneficiary stated their PCP was unaware of their enrollment with TOPANGA.  Many of the beneficiaries and/or caretakers had pushed back against TOPANGA to cancel services or were removed from services when they began to ask questions about the nature and necessity of the services.  Moreover, although patients should have a terminal diagnosis under which they are expected to pass away within six months or less if the condition takes its natural course, TOPANGA had a non-death discharge rate of approximately 85% which is nearly five times the national average of 17.2 % from 2021.[1]

11.  A review of bank accounts shows an intake of money from government healthcare programs primarily into one bank account controlled by E.R. and MINERD, and then a movement of this money into personal bank accounts for E.R. and/or MINERD as well as business accounts for entities also controlled by E.R. and/or MINERD.  In addition, hundreds of thousands of dollars were withdrawn in cash.  Based on my training and experience, these facts are consistent with efforts to conceal the ownership, control over, and location of fraudulent proceeds.

## IV. STATEMENT OF PROBABLE CAUSE

12.  Based on my review of financial records, business records, witness interviews, and other documents, conversations with others involved in this investigation, my training and

---

[1] As addressed in more detail later in this affidavit, the National Hospice and Palliative Care Organization's 2023 and 2024 editions of the NHPCO Facts and Figures listed nondeath discharges as 17.4 % (in 2019) 15.4 % (in 2020), 17.2 % (in 2021), and 17.3 % (in 2022) of all Medicare hospice discharges.

experience, and my own participation in this investigation, I am aware of the following information.

**A.   BACKGROUND INFORMATION REGARDING MEDICARE BENEFITS**

13.   Medicare is a federal health insurance program for individuals 65 years of age and older, certain younger people with disabilities, and people with End-Stage Regnal Disease. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

14.   The Centers for Medicare & Medicaid Services ("CMS") is the federal agency that runs the Medicare Program.  CMS is a branch of the HHS.  Medicare is paid for through two trust fund accounts held by the U.S. Treasury.

15.   Individuals enrolled into Medicare are referred to as Medicare beneficiaries ("beneficiaries") and are assigned a unique health insurance claim number ("HICN") and/or Medicare Beneficiary Identifier ("MBI").

1.   Medicare Enrollment for Providers

16.   All physicians, as well as eligible professionals (hereinafter "providers") as defined in Section 1848(k)(3)(B) of the Social Security Act must complete a Medicare enrollment application[2] to enroll in the Medicare program, receive a Medicare billing number, and bill for services rendered to Medicare beneficiaries.  Providers must establish a National

---

[2] Medicare enrollment applications can be submitted electronically through the Provider Enrollment, Chain and Ownership System ("PECOS") or with the appropriate hardcopy CMS-855.

Provider Identifier[3] prior to submitting a Medicare enrollment application.

17.    The submission of a Medicare enrollment application requires the provider to agree to adhere to all Medicare program requirements and applicable laws to include, but not limited to, the following: the provider will not misrepresent or falsify any information on the Medicare enrollment application; the provider will not submit false or fraudulent claims for payment by Medicare; and the provider will not submit claims based on underlying transactions that violate applicable laws and regulations, including the Anti-Kickback Statute.[4]

### 2.    Medicare Claim Submission

18.    Providers can submit Medicare claims electronically pursuant to an Electronic Data Interchange ("EDI") enrollment or with the appropriate hardcopy claim submission form.  Claims submitted to Medicare must contain the following: beneficiary's name, date of birth, and HICN or MBI; the date of the service; current procedure terminology ("CPT")[5] code; diagnosis code; and

---

[3] The NPI is a unique 10-digit identification number for covered health care providers.  Covered health care providers, all health plans, and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under the Health Insurance Portability and Accountability Act ("HIPAA").

[4] The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a criminal law that prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients). Remuneration includes anything of value and can take many forms besides cash.

[5] CPT is a medical code to report medical, surgical, and diagnostic procedures and services.

the physician's name, Medicare number, and NPI number of who prescribed or ordered the service.  A provider submitting a claim to Medicare for payment must agree and adhere to the following: the provider will be responsible for all claims submitted to Medicare for payment; the provider will only submit claims to Medicare for beneficiaries who have given their written authorization to do so; the provider will submit claims that are accurate, complete, and truthful, the provider will retain all original source documentation and medical records for claims submitted to Medicare for at least 6 years and 3 months after the claim is paid.

### 3.    Medicare Payments to Providers

19.  Providers most commonly receive payments from Medicare electronically pursuant to an Electronic Funds Transfer Authorization Agreement ("EFT") also known as ("aka") a CMS-588 form.  The EFT contains the bank routing number and account number for Medicare to send payments for claims submitted by the provider.

### 4.    Hospice Care Under Medicare

20.  Hospice care[6] is a benefit under the hospital insurance program, Medicare Part A.  To be eligible to elect hospice care under Medicare, a beneficiary must be entitled to Medicare Part A and be certified as being terminally ill.  A beneficiary is considered to be terminally ill if the medical prognosis is that the beneficiary's life expectancy is 6 months or less if the

---

[6] Hospice care is for terminally ill individuals electing not to use life-prolonging medical services.

illness runs its normal course.  The Medicare hospice benefit is only covered by a Medicare certified hospice.[7]  Of note, the term palliative care can be used when discussing hospice services because hospice services are palliative in nature.  However, there is a not a separate billing structure or code when a hospice is billing for palliative care; services deemed palliative as billed by a hospice.  Medicare will not reimburse for palliative services if a beneficiary is not hospice eligible.

21.   The hospice admits a beneficiary only on the recommendation of the medical director in coordination with the beneficiary's attending physician (if any) and only when the beneficiary elects hospice care.

22.   A hospice can only admit a patient for Medicare coverage of hospice services when: (a) the beneficiary's attending physician[8] and the hospice medical director certify, in writing, that the beneficiary is terminally ill and has six months or less to live if the beneficiary's illness runs its normal course; and (b) the beneficiary signs a statement

---

[7] TOPANGA enrolled in Medicare and was approved to be a provider effective February 20, 2020, and the company resigned the certification statement periodically thereafter.

[8] According to the Medicare Benefit Policy Manual, the attending physician is a doctor of medicine or osteopathy who is legally authorized to practice medicine or surgery by the state in which he/she performs that function, or a nurse practitioner, and is identified by the beneficiary, at the time he/she elects to receive hospice care, as having the most significant role in determination and delivery of the individual's medical care. Based on my training and experience and in speaking with other law enforcement agents, the medical practitioner with the most significant role in an individual's medical care is usually their primary care physician.

choosing to receive hospice care instead of other Medicare benefits.

23. The hospice must obtain a written certification[9] of terminal illness for each benefit period, even if a single election continues in effect. A complete written certification must include: the beneficiary's medical prognosis is a life expectancy of 6 months or less if the terminal illness runs its normal course; specific clinical findings and other documentation supporting a life expectancy of 6 months or less; the signature(s) of the physician(s), the date signed, and the benefit period dates that the certification or recertification covers; and a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice beneficiary prior to the beginning of the third benefit period, and prior to each subsequent benefit period.

24. A beneficiary may elect to receive Medicare coverage for two 90-day periods, and an unlimited number of 60-day periods. If the beneficiary elects to receive hospice care, the beneficiary must file an election statement with the hospice. Hospices obtain election statements from the beneficiary and file a Notice of Election with the Medicare contractor. The election statement must include: the identification of the hospice; the beneficiary's acknowledgment that the beneficiary

---

[9] Only a medical doctor or doctor of osteopathy can certify or re-certify an individual as terminally ill. Nurse practitioners and physician assistants cannot certify or re-certify an individual as terminally ill.

understands that certain Medicare services are waived;[10] the date of the election; the beneficiary's designated attending physician and the beneficiary's acknowledgment that the designated physician was the beneficiary's choice; and the beneficiary's signature.

25.    A beneficiary may revoke the election of hospice care at any time in writing.  A hospice cannot revoke a beneficiary's election.  In order to revoke the election of hospice care a beneficiary must file a signed statement that includes: the beneficiary's decision to revoke the hospice benefit; and the date the beneficiary revoked hospice.

26.    Discharge from hospice can occur if the beneficiary decides to revoke the hospice benefit; transfers to another hospice; dies; moves out of the hospice service area; or the beneficiary's condition improves and is no longer considered terminally ill.

### B.    MINERD Controlled TOPNAGA

27.    I reviewed a Medicare Enrollment Application for TOPANGA which listed 50% ownership by A.V. and 50% ownership by E.R. (MINERD's husband).  The enrollment application listed TOPANGA's address as 8374 Topanga Canyon Boulevard Suite 212, West Hills, CA 91304, and TOPANGA's NPI was 1528627106.  In subsequent amended Medicare enrollment records, as of July 31,

---

[10] Upon electing the Medicare hospice benefit, the beneficiary waives the right to Medicare payment for any Medicare services related to the terminal illness and related conditions (i.e., the patient's prognosis) during a hospice election, except when provided by, or under arrangement by, the designated hospice or individual's attending physician if he or she is not employed by the designated hospice.

11

2020, N.L. was designated the Medical Director for TOPANGA. Amended enrollment forms were again provided to Medicare on November 8, 2021, and listed E.R. with 100% ownership of TOPANGA.  E.R. subsequently signed certification statements as the authorized official on August 23, 2022, September 6, 2022, and September 19, 2022.  Witness interviews revealed that MINERD was described as the owner and being in charge of the day-to-day operations at TOPANGA whereas E.R. had nothing to do with the running of or day-to-day operations of TOPNAGA.  The following statements were provided by the noted employees indicating MINERD's control over the business:

a.    On the day of the search warrant at the TOPANGA office in October 2024, law enforcement interviewed office manager M.M.  During the interview, she was asked about the roles of E.R. and MINERD, to which she stated E.R. came into the office regularly to pick up the mail and check on the business, but that MINERD, "handles everything."

b.    Employee E.B., the Director of Patient Care Services for TOPANGA, stated the patients who were enrolled with TOPANGA were referred to MINERD and then MINERD would send people to see them for assessments.  MINERD and her husband, E.R., were in charge of TOPANGA. E.R. was the CEO, but he did not run the clinical side of the business. MINERD was more clinical and gave the instructions and lists of patients to be seen for admission.

c.    Employee J.G., the DCPS Designee for TOPANGA, stated MINERD helped with the marketing by going to board and

12

cares,[11] hospitals, and skilled nursing facilities to get patients.  MINERD's husband, E.R., was the CEO of TOPANGA, but he was not really involved in the day-to-day activities at TOPANAGA. E.R. attended administrative meetings but he did not attend IDT meetings.  MINERD attended IDT meetings because she was a nurse.

        d.     Employee A.N., who worked as the intake coordinator at TOPANGA until approximately February 2023, stated E.R. and MINERD were the owners of TOPANGA.  E.R. was an owner, but MINERD was a licensed vocational nurse and had more clinical knowledge.  E.R. did not do clinical tasks, and A.N. rarely saw E.R., stating he just did "drop-ins," checking on the office to see if the staff was actually present.  A.N. called E.R.'s visits quick "hi and bye" visits.  MINERD did not come to the office much either, except for the Interdisciplinary Team Meetings ("IDT") meetings.[12]  MINERD did the marketing for TOPANGA.  MINERD would call the TOPANGA office with possible patient admissions and patient referrals.  MINERD would also call the office to check patient eligibility and handle other matters.

---

[11] Board and care facilities are facilities that are in a residential home that has been licensed by the state of California to provide non-medical care for elderly residents.

[12] An IDT meeting is a mandatory meeting that takes place at least every 15 days per Medicare requirements during which the doctors, nurses, social workers and spiritual advisors gather to discuss, among other things, the current status of each patient and their progress, the plan of care, any significant changes, and continued appropriateness of the patient for hospice services.

e.    Employee M.A., an RN who did admissions for the business, stated she dealt directly with MINERD.  M.A. said that MINERD provided the diagnoses for some of the patients M.A. conducted pre-admission assessments on for TOPANGA, rather than from the patients directly or medical records.

28.  I have reviewed records from the California Secretary of State database and as of December 10, 2021, E.R. updated the records for TOPANGA with E.R. as the CEO and Director and MINERD as the Secretary and Chief Financial Officer ("CFO").  On February 2025, (a few months after the search warrant was executed at the TOPANGA offices and on MINERD's phone), MINERD was removed as CFO, and E.R. was then listed as both the CEO and CFO for TOPANGA.

29.  I reviewed bank records obtained from Bank of the West and U.S. Bank.  The bank records showed that as of July 29, 2020, E.R., MINERD, A.V., and A.V.'s wife became signers on the TOPANGA corporate bank account with Bank of the West.  Later, on April 21, 2021, E.R., MINERD, A.V., and A.V.'s wife opened two new TOPANGA accounts with U.S. Bank.  On November 16, 2021, A.V. and his wife were removed as signers leaving E.R. and MINERD as the two signatories on the TOPANGA accounts.

30.  Of note, in the Medicare enrollment application, Section 15 consists of a Certification Statement, the signer of which attests to having read the requirements listed and understanding them.  The Certification Statement spells out, among other things, the fact that the signer agrees to abide by the Medicare laws, regulations and program instructions, and

14

that payments of claims are conditioned upon the claim and the underlying transaction complying with those laws.  The Certification Statement specifically lists one of those laws being the Federal Anti-Kickback statute noted above.  E.R. signed this section on August 23, 2022, September 6, 2022, and September 19, 2022, as the CEO.  The enrollment and certification statement also requires that the signer list anyone managing the business.  E.R. failed to list MINERD who was running the day-to-day operations of TOPANGA.

31.  The electronic funds transfer ("EFT") authorization agreement for TOPANGA listed the Bank of the West TOPANGA account number x2138 noted above.  E.R. and MINERD took ownership over this account on July 29, 2020, and Medicare electronic deposits can be seen going into the account beginning in September 2020 and ending May 2021.  On or about April 21, 2021, two new TOPANGA bank accounts numbered x0132 and x0140 were opened with U.S. Bank (hereafter referred to as "TOPANGA USB x0132" and "TOPANGA USB x0140," respectively).  Medicare EFT records indicate E.R. changed the EFT enrollment to TOPANGA USB x0132 and Medicare electronic deposits can be seen starting September 2021.  The most recent EFT authorization signed by E.R. on September 6, 2022, changed the EFT enrollment to the TOPANGA USB x0140 account, however Medicare deposits continue into the TOPANGA USB x0132 account through the end of September 2023.  Bank records show that funds moved between the two TOPANGA USB accounts with the primary flow being from TOPANGA USB x0132 to TOPANGA USB x0140, and the funds flowing out of

15

TOPANGA USB x0140 appear to be primarily payments to E.R. and MINERD, payments to MINERD's company, and personal expenses for E.R. and MINERD, including the purchase of and payments for vehicles and property.

32.  These bank records showed that between on or about July 24, 2020, and September 29, 2023, Medicare deposited approximately $4.975 million into the various TOPANGA accounts.

**C.    Beneficiary Interviews Confirm that TOPANGA Is Fraudulently Billing Medicare For Services Never Provided Or Not Medically Necessary**

33.  As a part of this investigation, agents interviewed approximately 28 beneficiaries to date that were billed to Medicare for hospice services purportedly provided by TOPANGA hospice.  At least 27 of the 28 beneficiaries interviewed did not appear to be terminally ill or did not appear to qualify for hospice.  In fact, some beneficiaries were unaware that they were billed to Medicare for hospice services.

34.  As detailed below, agents interviewed the below five Medicare beneficiaries (or their immediate family members) who were enrolled in TOPANGA and billed to Medicare for purported hospice services.  I understand that TOPANGA submitted claims to Medicare for hospice services which all five beneficiaries did not need, and in some cases, that were not provided.  The information provided by the five TOPANGA beneficiaries was generally consistent with the type of information provided by or in relation to the other 22 beneficiaries or care providers interviewed in this case that were enrolled in TOPANGA and billed to Medicare for purported hospice care.

16

35.   In addition to interviewing 28 beneficiaries, agents interviewed five PCPS. None of the PCPs indicated that any of the beneficiaries were appropriate for hospice, though one of them stated she heard her patient had been put into a hospice service but that she had not recommended the patient for hospice care.

36.   I conducted a review of TOPANGA's Medicare claims data and noted that there were several sets of married or cohabitating beneficiaries who were enrolled and discharged during the same timeframes.  Based on my training, experience, and in speaking with other agents, this is indicative of fraud due to the unlikelihood of spouses or cohabitants needing to be enrolled in hospice during the exact same timeframe, and then discharged also during the same timeframe from hospice.

### 1.   Medicare Beneficiaries T.B. and R.B.

#### a.   *Interview of T.B. and R.B.*

37.   On September 11, 2023, agents interviewed T.B. and her husband R.B.  Also present was their daughter, M.S.  During the interview, both T.B. and R.B. were mobile, able to walk freely without assistance around their apartment, and sat on the living room couches while speaking with the agents.  The following is a summary of the interview:

a.   M.S. stated she was initially unaware that her parents had been signed up with TOPANGA beginning December 2022. In or around June 2023, M.S. received a call from a TOPANGA employee because he had not been able to get either T.B. or R.B. on the phone and M.S. was listed as their emergency contact.

17

M.S. asked him why her parents were enrolled in hospice because they did not need it.  M.S. stated she worked at a hospital in the billing department, and though she was not in a clinical position, she knew this was fraud.  Approximately three weeks prior to the interview, she had reported the situation to Medicare.  Later in the interview, M.S. described her parents as mobile, taking Ubers to and from their apartment, and restated that they did not need hospice services.

b.    M.S. stated neither T.B. nor R.B. had ever been diagnosed with a terminal illness nor had they been told they had six months or less to live.  Neither T.B. nor R.B. had been diagnosed with hypertensive heart disease with heart failure.  T.B. stated she had chronic kidney disease but it was not terminal.  M.S. patted R.B.'s chest and said he is very healthy, and R.B. nodded.

c.    R.B. stated he and T.B. heard about TOPANGA when he was approached by a nurse at a Filipino market.  They were asked to sign up for hospice to receive all the benefits.  After the nurse's initial approach, she and three others from TOPANGA hospice came to R.B. and T.B.'s home to describe the services and sign them up.  R.B. identified the individuals as a female doctor, a nurse, another individual, and MINERD.  MINERD had provided them with her business card at the time, which M.S. produced for the agents to see, and the card included MINERD's photo.  MINERD's photo on her card appears consistent with MINERD's photo from the California DMV.  MINERD and the others told R.B. and T.B. that if they joined TOPANGA, everything would

18

be free, and they were promised $300 per month in addition to the services.  R.B. said the money was provided monthly in an envelope in cash, $600 for each month December 2022 through May 2023.  After TOPANGA called M.S. in June 2023, they stopped the services and a TOPANGA employee told R.B. they thought M.S. was going to tell on them.

d.    M.S. stated TOPANGA had ordered a lot of things T.B. and R.B. did not need, including wheelchairs.  TOPANGA also sent things such as Ensure, Glucerna, and non-prescription vitamins.

e.    M.S. provided the agents with the TOPANGA binders for R.B. and T.B. that were at the home.  In T.B.'s binder, N.L. was listed as the Medical Director as well as the Referring/Attending/Patient Choice Physician. M.S., R.B. and T.B. were shown a photo of N.L but none recognized him.

b.    *Text message from L.M. to MINERD regarding M.S., R.B. and T.B.*

38.  A review of MINERD's phone, which was seized pursuant to a search warrant simultaneous with the TOPANGA office search, showed a text message on June 6, 2023, during the time frame that R.B. and T.B. were enrolled in hospice services with TOPANGA, from L.M., a licensed vocational nurse at TOPANGA, to MINERD stating in summary that, when he spoke to M.S., she was very upset that her parents were enrolled in hospice and when he, L.M., called to schedule a visit, M.S. had no idea that her parents were enrolled in hospice.  A review of the claims data related to T.B. and R.B. show that TOPANGA noted the last date

19

of services for both T.B. and R.B. was June 12, 2023, and those claims were submitted on or around July 3, 2023 and prorated for that end of service date.

39. As noted in the interview section above, T.B. and R.B. had been visited by MINERD and enrolled based on promises of kickbacks, and, based on the text message above, without the knowledge of their daughter who was involved in their care. Based on my training and experience, the offering of kickbacks clearly indicates that MINERD knew T.B. and R.B. were not appropriate for hospice care, and because she was the one to whom L.M. reached out after he was confronted by their daughter, it shows she was also the one to whom he knew to reach out if a problem such as this occurred, wherein someone was questioning the propriety of a TOPANGA enrollment.

     c. *Interview of Dr. K.K., PCP for T.B. and R.B.*

40. On October 10, 2023, agents interviewed Dr. K.K., the primary care physician for both T.B. and R.B. The following is a summary of the interview:

    a. Dr. K.K. had been seeing T.B. since 2013, and she was still a patient of his.

    b. Dr. K.K. said he could definitively say neither T.B. nor R.B. were candidates for hospice services. When told T.B. had been admitted to hospice between December 2022 and June 2023, he said he had seen her in March 2023, May 2023, and he had just seen her in August 2023. Dr. K.K. commented that if T.B. or R.B. had told him they were on hospice services, he would have told them to get out of such services.

c.    When told the hospice company had said T.B. had hypertensive heart disease with heart failure, Dr. K.K. said she did not have, nor had she ever, had heart failure, but she did have high blood pressure.  He added she also had diabetes and at one point had a minor stroke, but that she had never had heart failure.  Dr. K.K. had never considered T.B. to be terminal or to have six months or less to live.

d.    No hospice company had ever reached out to Dr. K.K. regarding T.B. to request records or to coordinate care. Dr. K.K. said T.B. would never have been eligible for hospice services.

e.    Regarding R.B., Dr. K.K. said he had just seen R.B. the day prior to the interview.  R.B. had been a patient of Dr. K.K.'s since 2013 along with T.B.

f.    When told R.B. had been admitted to hospice for hypertensive heart disease with heart failure, Dr. K.K. said R.B. did not have heart failure and had only a very mild case of high blood pressure.  Dr. K.K. did not consider R.B. terminally ill and stated there was a "zero percent" chance he was terminally ill.  No hospice company had reached out to obtain records or coordinate care for R.B.  Dr. K.K. stated he had referred other patients to hospice in the past, but not R.B. or T.B.

21

d.      *Medicare Claims Data for T.B.*

41.    I reviewed Medicare claims[13]  submitted by TOPANGA to Medicare (hereinafter "TOPANGA Claims Data").  According to TOPANGA Claims Data, T.B. was enrolled with TOPANGA from December 16, 2022, to June 12, 2023, with a diagnosis of "Hypertensive Heart Disease with Heart Failure," and with attending physician N.L.  The total amount billed to Medicare by TOPANGA for T.B. was approximately $38,400 and the total paid by Medicare for those claims was approximately $37,932.[14]

e.      *Medicare Claims Data for R.B.*

42.    According to TOPANGA Claims Data, R.B. was enrolled with TOPANGA from December 16, 2022, to June 12, 2023, with a diagnosis of "Hypertensive Heart Disease with Heart Failure," and with attending physician N.L.  One claim submitted by TOPANGA for R.B. includes a claim submitted on or about May 1, 2023, with Medicare claim number 22312100184104CAR, for purported hospice services to in the amount of $6,400.00.  The total billed to Medicare by TOPANGA for R.B. was approximately

---

[13] The Medicare claims submitted by TOPANGA to Medicare were extracted on June 10, 2024, from the Center for Medicare and Medicaid Services' ("CMS") Business Objects – One Program Integrity database by Special Agent Davis and transmitted to me. The Medicare claims were filtered by claims submitted from January 1, 2020, through June 10, 2024.  This is true for all Medicare claims noted in this affidavit.

[14] The services and claims made by TOPANGA for all these beneficiaries were for hospice care and thus medically unnecessary based on the beneficiary interviews, statements by the primary care physicians and a review of the medical records.

22

$38,400 and the total paid by Medicare for the claims was approximately $37,932.[15]

　　　　　　　2.　　Medicare beneficiaries M.A. and L.A.

　　　　　　　　　a.　　*Interview of M.A. and L.A.*

43.　On December 20, 2022, agents interviewed M.A. and L.A. outside their residence.　When agents arrived, M.A. was located outside on a ladder installing solar lighting and cameras on his eaves and roof.　The following is a summary of the interview:

　　　　a.　　M.A. stated he initially heard about TOPANGA when someone came to his house and knocked on his door.　He told the person he did not have any medical problems.　M.A. said the person encouraged him to go with TOPANGA on hospice, and if he was willing, they would enroll him.

　　　　b.　　TOPANGA enrolled M.A. and his wife L.A., and the nurses came to see them.　M.A. stated he was worried about being rude, but also did not want something he did not need.　M.A. felt they had enrolled him despite him not needing the services, so he ultimately called them up and told them he did not need it (neither he nor L.A.).

　　　　c.　　M.A. said neither he nor L.A. had ever been diagnosed with a terminal illness nor were they ever told they had six months or less to live.　M.A. said Dr. Amy Wang of Torrance Memorial was the PCP for both M.A. and L.A.　M.A. made

---

[15] Of note, these beneficiaries, T.B. and R.B., who are husband and wife, who cohabitate, and who were recruited at a supermarket, were also enrolled and discharged on the exact same dates and claims were submitted and reimbursed for exactly the same dollar amounts, which, based on my training and experience, is highly indicative of fraud.

a comment about TOPANGA billing Medicare for services he did not need, stating, "I don't know what these people are trying to do," and, "Maybe collect money from the government…that's not right."

d.   L.A. came out at the end of the interview to speak to the agents.  The agents explained why they were there, and asked L.A. if she had ever been diagnosed with any terminal illness or told she had six months or less to live, and she exclaimed, "Not yet!"

b.   *Medicare Claims Data for M.A.*

44.   According to TOPANGA Claims Data I reviewed, M.A. was enrolled with TOPANGA from December 19, 2020, to May 19, 2021, with a diagnosis of "Atherosclerotic Heart Disease of Native Coronary Artery Without Angina Pectoris," and with attending physician N.L.  The total billed to Medicare by TOPANGA for M.A. was approximately $32,870 and the total paid by Medicare for the claims was approximately $32,115.

c.   *Medicare Claims Data for L.A.*

45.   According to TOPANGA Claims Data I reviewed, L.A. was enrolled with TOPANGA from December 16, 2020, to May 19, 2021, with a diagnosis of "Hypertensive Heart Disease without Heart Failure," and with attending physician N.L.  The total billed to Medicare by TOPANGA for M.A. was approximately $33,465 and the

24

total paid by Medicare for the claims was approximately $32,689.[16]

### 3.    Medicare Beneficiary M.Ab.

#### a.    *Interview of M.Ab.*

46.    On June 13, 2024, agents interviewed M.Ab.  Upon initial contact, M.Ab. came to the door, walking without assistance and moving freely.  The following is a summary of the interview:

a.    The house in which M.Ab. was staying was a group home environment, with many people renting rooms.  M.Ab. said the owner/operator of the house was named "Gloria."[17]  M.Ab. said TOPANGA told her they would give her $300 per month for using their services.  Gloria told M.Ab. that she (Gloria) was getting $1,500 per month per person she signed up for TOPANGA services, and M.Ab. said the $300 was supposed to come from Gloria.  M.Ab. said $300 is a lot of money to her, but she only received it twice, and when she did, the money came from Gloria.

b.    M.Ab. said when she was receiving services from TOPANGA, they sent her all sorts of stuff she didn't need

---

[16] Of note, these beneficiaries, M.A. and L.A., who are husband and wife, who cohabitate, and who were recruited by someone who knocked on their door, were also enrolled on nearly the same date and discharged on the exact same date and claims were submitted and reimbursed for almost the same dollar amounts, which, based on my training and experience, is highly indicative of fraud.

[17] Not every beneficiary interview is noted in this affidavit.  In another interview not detailed here, this owner and/or operator was identified by a different beneficiary as G. C.  G.C. owned/operated multiple locations where beneficiaries of TOPANGA resided.  G.C. will be addressed further in a separate section below.

including boxes of diapers.  M.Ab. said several times during the interview that she thought TOPANGA kicked her off of services because she asked too many questions.  For example, when they started services, they gave her a book that told her she couldn't dial 911 and to call them instead, and M.Ab. had pushed back.

c.    M.Ab. was told TOPANGA had said she had hypertensive heart disease without heart failure when enrolling her, to which M.Ab. responded by laughing and saying her heart was the healthiest part of her.

b.    *Interview of Dr. L.R., Primary Care Physician for M.Ab.*

47.  On October 21, 2024, agents interviewed Dr L.R., and the following is a summary of the interview:

48.  Dr. L.R. stated M.Ab. had been his patient since approximately 2019, and confirmed he was her primary care physician.

49.  Dr. L.R. stated he had been practicing since 1978 and had also been the medical director at nursing homes and hospitals.  He had recommended people for hospice services before, and said hospice was for people who were not salvageable, but typically the hospital or emergency room physician would evaluate a patient for hospice when discharge planning.  Dr. L.R. had never signed a certification for terminal illness.

50.  Dr. L.R. described M.Ab. as alert and not confused. He stated she smoked a lot and had COPD (for which she had not

26

been prescribed oxygen), but that she could take care of herself.  M.Ab. had hypertension, but that was controlled with medications.  Dr. L.R. stated M.Ab. did not have any heart conditions.  Neither he nor anyone from his office had diagnosed M.Ab. with hypertensive heart disease without heart failure.  Dr. L.R. stated M.Ab. did not have any terminal diagnoses and she would not even have qualified for home health.  Dr. L.R. had not heard of TOPANGA nor had he received any requests from them for M.Ab.'s medical records.

### c.    Medicare Claims Data for M.Ab.

51.  According to TOPANGA Claims Data I reviewed, M.Ab. was enrolled with TOPANGA from October 12, 2022, to December 20, 2022, with a diagnosis of "Hypertensive Heart Disease without Heart Failure," and with attending physician N.L.  The total billed to Medicare by TOPANGA for M.Ab. was approximately $15,256 and the total paid by Medicare for the claims was approximately $16,722.[18]

### D.    MINERD Was Aware Patients at TOPANGA Didn't Qualify For Hospice Care

52.  On March 5, 2026, agents interviewed E.B., a Registered Nurse who, as stated previously, worked at TOPANGA as the Director of Patient Care Services from approximately July

---

[18] Of note, in certain instances noted in this affidavit, the amount paid by Medicare exceeds the amount claimed due to providers being paid on the Prospective Payment System. According to CMS, the payment amount for a particular service is derived based on the classification system of that service, and the Prospective Payment System is a method of reimbursement in which Medicare payment is made based on a predetermined, fixed amount.

2020 through March 2023. In this position, E.B. would conduct nursing assessments of patients and supervisory nursing visits.

53.    E.B. stated he knew G.C. as an owner of one or two of the facilities from which TOPANGA treated patients. E.B. met G.C. when TOPANGA had enrolled some of the patients at her facilities into hospice. E.B. was not aware of why G.C. would get paid by MINERD; however, E.B. heard that G.C. was giving some patients from her facilities to TOPANGA for hospice care. E.B. always declined to admit those patients for hospice because most of G.C.'s patients were not qualified for hospice. MINERD asked E.B. why he was so strict with his hospice admissions, to which E.B. told MINERD that he had to protect his nursing license.  E.B. thought that when MINERD thought a patient did not qualify for hospice, she would send another nurse instead of E.B. to do the hospice admission because she knew E.B. would not sign them up for hospice.

54.    E.B. sometimes would think that patients knew the answers to the questions that he would ask them during his assessments. He thought those statements were coached to the patients by MINERD, who he thought spoke to most patients before he went to evaluate them.  E.B. would become suspicious when he went to visit patients and the patients were not home. He would become suspicious that patients were not qualified for hospice. E.B. would bring these matters up at the IDT meetings. N.L. (the medical director) was very strict and would say to discharge the patient.  E.B. thought N.L. trusted E.B. more than he trusted the owner, MINERD.

28

55.   E.B. said MINERD scared him because she would tell him that he was so strict with his hospice admissions. E.B. was worried that MINERD was trying to make him do something that he should not be doing.  E.B. said he felt pressure to admit patients to hospice.

56.   In a previous interview with E.B. on February 19, 2026, E.B. stated if a patient did not qualify and they were not terminal, he would tell MINERD not to admit the patient. If BERCES assessed a patient over the phone and decided they did not qualify, MINERD would sometimes send another nurse to do the assessment in person.

**E.    MINERD's Communications and Payments with Marketers G.C., J.C., and R.T. Support An Illegal Kickback Scheme**

57.   As noted above, during beneficiary interviews, G.C., with an identified phone number, came up during interviews as the owner and/or operator of various boarding houses.  Agents visited at least two of these houses and observed multiple people residing inside both.

58.   M.Ab. noted that G.C. made statements to her about receiving payments for each individual she signed up for TOPANGA services.  Agents received and reviewed phone records and bank records for both E.R. and MINERD to determine the extent of contact with G.C.  There was no contact between E.R. and G.C., between February 19, 2022, and May 31, 2023 (a total of 467 days).  Within the same time frame, there were 306 calls between MINERD and G.C., with the majority of those calls (215 total) being made by G.C. to MINERD.  Of note, there were zero text

messages exchanged between the two.  Based on an analysis of MINERD's phone records, she had text and voice contact with nearly every other individual she was communicating with, sometimes into the hundreds or even thousands of texts.  Based on my training and experience, individuals engaging in criminal behavior will avoid things like text messages over a common carrier line in order to avoid detection and potential collection; many times they will utilize encrypted chat applications such as Telegram or Signal in order to obfuscate their written communications and keep them from being remotely accessed by law enforcement.

59.  I reviewed summary translations of voicemails left by G.C. to MINERD which included the following:

a.    In a voicemail on November 27, 2021, G.C. told MINERD that the people whom MINERD is supposed to enter are persistently asking G.C. because they are waiting for money. G.C. tells MINERD to let her know if MINERD cannot enter them yet so G.C. will know what to do.[19]

b.    In two voicemails from January 25, 2022, G.C. requests to be paid in cash instead of check.

c.    In a voicemail on August 8, 2022, G.C. talks about someone whose spouse was taken to the emergency room. G.C. talks about a phone call because she is giving them 500 a month for six months.

---

[19] Based on my training and experience, by "supposed to enter" and "enter them yet," I believe G.C. is referring to MINERD enrolling the patients in hospice services and billing for the services.  This would then allow MINERD to pay the kickbacks referenced in this voicemail.

30

d.    In a voicemail on October 5, 2022, G.C. asks MINERD to call her and tells her "Mary", who used to not want to, now wants to be in because G.C. offered the money, the chocolate.[20]

e.    In a voicemail on March 5, 2024, G.C. called MINERD but then began to speak to an unknown female ("UF") in the background about a person named Patricia.  She asks if the UF has researched this person. G.C. says she's not making money from this person and it's been a year already.  G.C. says that those who do research pay her.  They also discuss that hospice is strict now because of the moratorium.  The UF tells G.C. that there's nothing to get from Medicare.

f.    In a voicemail on July 23, 2024, G.C. tells MINERD that she is ignoring G.C.  G.C. tells MINERD to call her and they can talk about the patients G.C. gave MINERD.

60.  An analysis of MINERD's bank records revealed one check written to G.C. for $1,600 on November 3, 2021.  This is directly in line with what M.Ab. said G.C. was getting per beneficiary she gave to TOPANGA.  The absence of further checks is likely due to the traceability of such transfers and G.C.'s request noted above to be paid in cash; therefore, I suspect they moved to using cash in order to avoid leaving a traceable money trail.

---

[20] Throughout the review of MINERD's phone data, the terms "chocolate" and "gift" are used often and based on my training and experience I believe these are code words for money and/or payment in relation to illegal kickbacks.

61.  On February 18, 2026, agents interviewed G.C. and in summary she stated:

a.    G.C. runs a room and board house/independent living facility, and she doesn't have hospice services there because, "I don't do hospice because they're not dying, they're walking."  She described that what MINERD did was home health and that MINERD sometimes paid G.C. $1,000 for a patient referral.

b.    When asked about the voicemail she left to MINERD asking about money and chocolate, G.C. said she remembered that voicemail and MINERD had offered her money.

c.    G.C. described that MINERD and TOPANGA were marketing to the beneficiaries and giving them $200 per month. The money for the beneficiaries would come in an envelope and was delivered by someone else from TOPANGA. G.C. was not to give beneficiaries their money from what she received from MINERD.

d.    G.C. described that sometimes the beneficiaries were upset because they would think that G.C. had their money, the $200 per month, and didn't give it to them.

e.    G.C. claimed that when she found out it was illegal to receive payment for patient referrals she stopped.

62.  Similarly, during a beneficiary interview, J.C. was present with beneficiary T.S. who told agents J.C. purportedly owned and ran the home.  T.S. told the agents that J.C. handled everything with respect to TOPANGA.  I reviewed phone records and bank records to determine the extent of contact between MINERD and J.C.  Between February 21, 2022, and May 31, 2023 (a

32

total of 465 days), there were 373 calls and texts between J.C. and MINERD, with the majority of those contacts (222 total) being made from J.C. to MINERD.  Based on my training and experience, even if there are native messages being sent between individuals, that does not preclude the use of encrypted chat applications being used as well.

63.  I reviewed summary translations of the text messages between MINERD and J.C., and found the following:

a.   June 11, 2024, from J.C.: Ate, what time can I get my gift

b.   June 12, 2024, from J.C.: Ate, thank you

c.   July 6, 2024, from J.C.: Ate, good morning. Kindly Zelle my gift because I paid our rent yesterday and the funds are low in my account. If it's okay, pewee, so that my check won't bounce. Thank you, Ate.

d.   July 6, 2024, from MINERD:  It's going to be on the 10th we don't have a collection yet

e.   July 6, 2024, from J.C.:  Okay, Ate. I will just wait.

f.   July 11, 2024, from J.C.:  Ate, can I get gift already?

g.   July 11, 2024, from MINERD:  Okay, I will send it through my husband.

h.   July 11, 2024, from J.C.:  Ate, just tell him now to call me. I'm at the house. This is our new address [redacted], Anaheim, CA 92804.

33

64.    September 9, 2024, from J.C.:   Ate, good afternoon. Is [L.T.] no longer in the program?  I thought I can still get something from [L.T.]. I have to use it to pay for a caregiver. An analysis of MINERD's bank records showed one check written to J.C. for $350 on November 19, 2020 (the pay to the order of line read, "Cash – Justina C").

65.    The above message is in line with what other beneficiaries stated they were receiving from TOPANGA for their enrollment.  As noted above, the absence of further checks is likely due to the traceability of such transfers, and therefore I suspect they moved to using cash or Zelle in order to avoid leaving a traceable money trail.

66.    On February 18, 2026, agents interviewed J.C., and she denied receiving any payments from MINERD.  She claimed the noted check was repayment for having loaned MINERD money.  She said she received no other money from MINERD, which is belied by the text messages noted above.  Additional bank records have been sought to address this matter and are outstanding as of the writing of this complaint affidavit.

67.    During an interview with agents on November 17, 2022, an individual R.T. who rented a house to rent out rooms, and he had relationships with hospitals, nursing care homes, and social workers who called him when they had someone who needed placement after discharge.  R.T. was present during agent interviews with beneficiaries from TOPANGA.  R.T. stated he did not contact TOPANGA or any other hospice or home care when a new resident came in and stated he did not know how the companies

34

found out about new residents; he stated perhaps the social worker or the companies themselves noticed a new resident and then automatically started care with the new residents.  R.T. stated he did not have a contact at TOPANGA.

68.  Using the phone number provided by R.T., I reviewed phone records and bank records for both E.R. and MINERD to determine if they had contact with R.T.  There was one telephonic contact with E.R., between January 3, 2022, and May 30, 2023 (a total of 513 days), and there were 201 contacts noted between MINERD and R.T., with only two of those contacts being text messages, and the majority of those calls (146 of 199 total) being made by R.T. to MINERD.  As noted above with G.C., this indicates a potentially purposeful avoidance of text messages.

69.  An analysis of bank records showed two checks written from the TOPANGA USB x0140 account to R.T. as follows: $3,000 on August 1, 2021, and $3,500 on September 5, 2021, with no other checks ever written.  These amounts are in line with what G.C. was purportedly being paid per customer and R.T and during the time of the interview, R.T. did have at least two renters in his house who had recently received TOPANGA services.  As noted above, the absence of further checks is likely due to the traceability of such transfers, and therefore I suspect they moved to using cash or Zelle in order to avoid leaving a traceable money trail.

70.  I reviewed summary translations of the following text messages between MINERD and R.T., and found the following:

35

a.    February 17, 2024, from R.T.: Hi Lolita. You mentioned that [F.] has extra meds. Can you send it to me by Zelle if you can? Thank you.

b.    February 17, 2024, from MINERD: I will just send it, Bossing. I can't do it through Zelle because I have my daily limit. Sorry.

c.    February 17, 2024, from R.T.: There's 96 left.

d.    February 17, 2024, from MINERD: Okay, thank you. I'm just in a bind since coming from the Philippines.

e.    February 20, 2024, from R.T.: It's just change/coins, you're still giving me a hard time.

## V.  MEDICARE Claims Data Analysis

71.  According to TOPANGA Claims Data I reviewed[21] TOPANGA submitted claims to Medicare from August 31, 2020, to April 24, 2025, for claims with dates of service ranging from July 29, 2020, to March 31, 2025.  TOPANGA billed Medicare for approximately 265 beneficiaries, totaling approximately 1,419 claims.  TOPANGA billed Medicare a total of approximately $9,174,117 and was paid by Medicare a total of approximately $8,510,448.

72.  The claims made by TOPANGA to Medicare as noted above and the associated numbers were all specifically for hospice services billed under the national claim code for hospice services, not any other types of services such as In Home Health

---

[21] TOPANGA CLAIMS DATA was based on claims submitted on or after July 24, 2020, the date indicated as the change of ownership to E.R., through to the last claims submitted which are noted in Medicare records as April 24, 2025.

36

Services, for which Medicare would not reimburse.  Therefore, there would be no argument that TOPANGA accidentally billed for hospice services, as equivalent services do not exist under a different national claim code.  Based on my training and experience and discussions with other law enforcement officers, I believe the billing for such services was therefore deliberate and would not have been reimbursable by Medicare under a different code.

73.  The nondeath discharge rate of Medicare patients from TOPANGA was approximately 85%.  According to the National Hospice and Palliative Care Organization's 2023 and 2024 editions of the NHPCO Facts and Figures[22] (hereinafter "the NHPCO Publications"), nondeath discharges were 17.4% (in 2019), 15.4% (in 2020), 17.2% (in 2021), and 17.3% (in 2022) of all Medicare hospice discharges.  TOPANGA's nondeath discharge rate is nearly 5 times higher than the rates referenced in the NHPCO Publication.  Based on my training, experience, discussions with other law enforcement officers and studying other hospice fraud cases, TOPANGA's nondeath discharge rate is indicative of fraud based on the following: Patients electing hospice services choose to stop curative treatments related to their terminal illness and choose care that provides them comfort until they pass away.  Based on the interviews of the Medicare beneficiaries, the beneficiaries were unaware they were on hospice, were not terminally ill or had a life expectancy of six

---

[22] The primary data source used for the findings in the NHPCO Publications is data from CMS.

months or less, and/or would not have wanted hospice services. Patients/beneficiaries discovering they were enrolled in hospice inappropriately or enrolled based on a ruse, like the beneficiaries interviewed from TOPANGA, are commonly discharged alive based on their request, or discharged by the company in an attempt to operate under the radar of CMS and law enforcement. TOPANGA's nondeath discharge rate being nearly 5 times the national average indicates beneficiaries were not appropriate for hospice when admitted to TOPANGA, and the claims submitted to Medicare were medically unnecessary and were fraudulent.

## VI. FINANCIAL ANALYSIS

### A.    TOPANGA Bank Accounts and Related Bank Accounts

74.    According to Medicare claims data I reviewed, a total of approximately $7,412,831, was sent to TOPANGA between January 1, 2020, and September 12, 2024.  The majority of the Medicare funds were then transferred to another TOPANGA bank account and personal bank accounts for E.R. and MINERD.  Additionally, there was approximately $650,000 withdrawn in cash.  Based on my training and experience and analysis of various accounts, I know that large cash withdrawals from bank accounts connected to fraudulent hospices can be consistent with payments to marketers and beneficiaries.  These payments are likely made in cash to avoid detection.  Additionally, based on some of the beneficiary statements in this affidavit, TOPANGA employees as well as at least one boarding house-facility owner, G.C., were paying beneficiaries $300 per month to be enrolled, and TOPANGA was likely paying at least two boarding house-facility owners or

38

operators per patient enrolled as well.  This was likely done primarily in cash, but one check was written to G.C. by MINERD from her personal account totaling $1,600, which is consistent with the amount alleged by beneficiary M.Ab., one check was written to J.C. by MINERD from her personal account totaling $350, and two checks, which appeared to be signed my MINERD, to R.T. for $3,000 and $3,500 from the TOPANGA USB x0140 account.

## VII.  CONCLUSION

75.  For all the reasons described above, there is probable cause to believe that MINERD has committed a violation of 18 U.S.C. § 1347 (health care fraud) by submitting or causing the submission of Medicare claim number 22312100184104CAR on May 1, 2023, for purported hospice services to R.B. in the amount of $6,400.00.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _30th_ day of
March, 2026.

THE HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

39